EOC:ALW/ERK
F.#2004r02094
KUMAR/RICHARDS.IND.wpd

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

   - against -

SANJAY KUMAR and
STEPHEN RICHARDS,

          Defendants.

- - - - - - - - - - - - - - x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
MAY 17 2005
★ BROOKLYN OFFICE ★

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 04-846 (S-1)(ILG)
(T. 15, U.S.C., §§ 78j(b),
78m(a) and 78ff; T. 18,
U.S.C., §§ 1001(a)(1),
1001(a)(2), 1512(c)(2),
1512(k), 1621(1), 371, 2
and 3551 et seq.)

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise stated:

I.   Background

   A.   Computer Associates

      1.   Computer Associates International, Inc. ("CA"), was a Delaware corporation with its headquarters and principal place of business located in Islandia, New York.  CA was one of the world's largest providers of computer software for use by businesses.  CA's reported revenue for its fiscal year ending March 31, 1999 was $5.253 billion.  CA's reported revenue for its fiscal year ending March 31, 2000 was $6.776 billion.

      2.   CA was a publicly traded corporation, the common stock of which was listed on the New York Stock Exchange.  CA's shareholders were located throughout the United States, including in the Eastern District of New York.

3.   CA did not sell or transfer title to its software products to its customers.  Instead, CA licensed its software products pursuant to license agreements by which CA's customers agreed to pay a one-time license fee and annual usage and maintenance fees.

B.   Certain Relevant Accounting Principles

4.   As a public company, CA was required to comply with the rules and regulations of the United States Securities and Exchange Commission (the "SEC").  The SEC's rules and regulations were designed to protect members of the investing public by, among other things, ensuring that a company's financial information was accurately recorded and disclosed to the investing public.

5.   Under the SEC's rules and regulations, CA and its officers were required to (a) make and keep books, records and accounts which, in reasonable detail, fairly and accurately reflected the company's business transactions, including its revenue and expenses; (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP"); and (c) file with the SEC quarterly reports (on Form 10-Q) and annual reports (on Form 10-K) which included financial

statements that accurately presented CA's financial condition and the results of its business operations in accordance with GAAP.

6. Under GAAP, four conditions were required to be met in order for revenue associated with a software license agreement to be recognized: (a) persuasive evidence of an arrangement was required to have existed; (b) delivery of the licensed products was required to have occurred; (c) the license fee was required to have been fixed or determinable; and (d) the collectibility of the license fee was required to have been probable.

7. When a written contract was used to memorialize a license agreement, the GAAP "persuasive evidence" criterion required that the contract be signed by both vendor and customer. Accordingly, under GAAP, in order for CA properly to have recognized revenue from a license agreement in a particular fiscal quarter, the license agreement was required to have been signed by both CA and its customer within that quarter.

8. When a license agreement was finalized and signed, for accounting purposes CA allocated its revenue among the license fee and the usage and maintenance fees, with 80 percent or more normally allocated to the license fee. CA then calculated the present value of the license fee, which was normally collected incrementally over the term of the agreement. The present value of the license fee, which was referred to

within CA as the "GAAP Value," was then recognized as revenue in the quarter in which the agreement was purportedly finalized and signed.

### C.    The Defendants and Co-Conspirators

9.    The defendant SANJAY KUMAR was employed by CA beginning in August 1987.  From April 1989 to December 1992, KUMAR was CA's Senior Vice President for Planning.  From January 1993 to December 1994, KUMAR was CA's Executive Vice President for Operations.  Effective January 1994, KUMAR became CA's President and Chief Operating Officer ("COO"), as well as a member of CA's Board of Directors.  In August 2000, KUMAR became CA's Chief Executive Officer ("CEO") and relinquished the title of COO.  In November 2002, KUMAR became the Chairman of CA's Board of Directors.  On April 14, 2004, KUMAR stepped down as CA's Chairman and CEO, and also resigned from CA's Board of Directors.

10.    The defendant STEPHEN RICHARDS was employed by CA beginning in or about 1988, through the company's Australian subsidiary.  In or about April 1998, RICHARDS became a General Manager in CA's Sales department.  In April 1999, RICHARDS became CA's Head of North American Sales.  In April 2000, RICHARDS became CA's Head of Worldwide Sales.  On April 26, 2004, RICHARDS resigned from CA.

11.    Ira Zar was employed by CA from 1982 to 2003,

during which time he occupied a variety of positions.  From approximately June 1998 to October 2003, ZAR was CA's Chief Financial Officer ("CFO").  During his tenure as CFO, Zar reported directly to the defendant SANJAY KUMAR.

12.  Steven Woghin is an attorney who was employed in CA's legal department from March 1992 to April 2004.  In 1993, Woghin became a CA Vice President.  In February 1995, Woghin became CA's General Counsel and a Senior Vice President.  During his tenure as General Counsel and Senior Vice President, Woghin reported directly to the defendant SANJAY KUMAR.

13.  David Kaplan was employed by CA from 1990 to 2003. Kaplan held a variety of positions in CA's sales accounting, general accounting and financial reporting departments.  From 1997 to 2001, Kaplan served as CA's Vice President of Financial Reporting.  From 2001 through 2003, Kaplan served as CA's Senior Vice President of Finance and Administration.

14.  David Rivard was employed by CA from 1998 to 2003. From 1998 to 2001, Rivard served as CA's Vice President of Sales Accounting.  From 2001 until 2003, Rivard served as CA's Vice President of Finance.

15.  Lloyd Silverstein was employed by CA from 1988 to 2003, during which time he occupied a variety of positions.  From 1998 to 2000, Silverstein was Divisional Senior Vice President in charge of CA's Global Sales Organization.

D.   Consensus Estimates

16.  CA regularly issued public predictions at the outset of each fiscal quarter of the revenue and earnings it expected to earn during that quarter.  Based in part on these predictions, professional stock analysts estimated what they believed would be CA's total revenue during the fiscal quarter and predicted the earnings per share of CA stock.  The average of the estimates of the professional analysts was commonly referred to as the "consensus estimate."

17.  CA's officers, executives and directors, including the defendants SANJAY KUMAR and STEPHEN RICHARDS, understood that CA's failure to meet or exceed the consensus estimate for a quarter would likely result in a substantial decrease in the company's stock price.  For example, on July 3, 2000, CA issued a press release which reported that the company expected "financial results for the first quarter [of fiscal year 2001] ending June 30, 2000 to be less than current Wall Street estimates."  In the press release, CA cited as one of the factors contributing to its failure to meet the consensus estimate "the fact that several large contracts that were expected to close in the final days of the quarter have been delayed . . . ."  On the date of the press release, which was issued after the market closed, CA's stock price closed at $51.12 per share.  On the next trading day, July 5, 2000, CA's stock price opened at $29.00 per share, representing a percentage drop of slightly more than 43 percent.

E.   The Scheme to Defraud: the "35-Day Month"

18.   Prior to and during CA's fiscal year 2000, which ended March 31, 2000, numerous CA officers and executives, including the defendants SANJAY KUMAR and STEPHEN RICHARDS, Ira Zar, David Kaplan, David Rivard and Lloyd Silverstein, engaged in a systemic, company-wide practice of falsely and fraudulently recording and reporting within a fiscal quarter revenue associated with certain license agreements even though those license agreements had not in fact been finalized and signed during that quarter.  This practice, which was sometimes referred to within CA as the "35-day month" or the "three-day window," violated GAAP and resulted in the filing of materially false financial statements.

19.   The practice was referred to as the "35-day month" because it involved artificially extending months, primarily the last month of a fiscal quarter, beyond the true end of the month. The practice did not, however, only result in months that were artificially extended to 35 days.  Instead, months were often artificially extended even longer.  Nonetheless, for the sake of simplicity, the practice is referred to hereinafter as the "35-day month practice."

20.   The central goal of the 35-day month practice was to permit CA to report that it met or exceeded its projected quarterly revenue and earnings when, in truth, CA had not met its

projected quarterly revenue and earnings.  As a result of the practice, CA reported falsely to investors and regulators during numerous fiscal quarters, including each of the four quarters of CA's fiscal year 2000, that it had met or exceeded its consensus estimates.  In fact, in each of the four quarters of fiscal year 2000, CA improperly recognized and falsely reported hundreds of millions of dollars of revenue associated with numerous license agreements that had been finalized after the quarter close.  In so doing, CA made misrepresentations and omissions of material fact which were relied upon by members of the investing public.

21.  As part of the 35-day month practice, the defendant SANJAY KUMAR, with the assistance of Ira Zar and others, routinely extended CA's fiscal quarters, normally for three business days.  This practice, which was known as "keeping the books open," was designed and executed so that CA could falsely record and report revenue associated license agreements finalized after the end of fiscal quarters.  The period including three business days after the end of fiscal quarters was referred to within CA as the "flash period."

22.  As a further part of the 35-day month practice, the defendants SANJAY KUMAR and STEPHEN RICHARDS regularly met and conferred with each other and with Ira Zar in the days leading up to and following the end of fiscal quarters, including during the flash period.  The purpose of these meetings was to

determine whether CA had generated for the quarter just ended, including during the flash period, sufficient revenue to meet the consensus estimate.  In each of the four quarters of CA's fiscal year 2000, KUMAR, RICHARDS and Zar collectively determined that the total revenue generated for the quarter by the end of the flash period was less than needed to meet the consensus estimate. In each such instance, KUMAR and Zar caused CA to keep its books open for additional days beyond even the flash period to generate sufficient revenue to meet the consensus estimate.

23.  As a further part of the 35-day month practice, while CA's books were held open, the defendants SANJAY KUMAR and STEPHEN RICHARDS instructed CA sales managers and salespeople to negotiate and finalize additional license agreements, which were backdated to disguise the fact that the agreements had been finalized after the end of the fiscal quarter.  CA salespeople regularly transmitted the backdated license agreements by facsimile to CA's headquarters.  CA then fraudulently recorded and reported in the earlier quarter revenue associated with the backdated agreements.

24.  As a further part of the 35-day month practice, numerous CA officers and executives concealed the existence of the practice from CA's outside auditors.  Among other things, CA executives engaged in a practice of "cleaning up" copies of backdated license agreements before providing copies of the

agreements to CA's outside auditors.  This practice included, but was not limited to, removing from license agreements facsimile stamps and other notations which showed the true date on which the agreements were finalized.  This practice was designed and carried out to prevent CA's outside auditors, and by extension the investing public, from learning of CA's failure to meet or exceed the consensus estimates for the given quarter.

(1)  First Quarter of Fiscal Year 2000

25.  The first quarter of CA's fiscal year 2000 included the period from April 1, 1999 to June 30, 1999 (the "First Quarter").  The consensus estimate for the First Quarter was that CA's earnings would be 47 cents per share.  When the First Quarter ended on June 30, 1999, CA had not generated sufficient revenue to meet the consensus estimate.

26.  On or about and between July 1, 1999 and July 8, 1999, the defendants SANJAY KUMAR and STEPHEN RICHARDS met and conferred with Ira Zar and others regarding the status of CA's revenue for the First Quarter.  In an effort to generate additional revenue during this period, KUMAR and RICHARDS instructed CA sales executives and sales managers to continue to negotiate and finalize additional license agreements, which were falsified to make it appear as though the agreements had been finalized by June 30, 1999.

27.   In total, for the First Quarter CA improperly recognized revenue associated with 4 license agreements having an aggregate GAAP Value of approximately $122 million.  The improperly recognized revenue represented approximately 10 percent of CA's reported revenue for the First Quarter.

28.   For example, on or about July 8, 1999, the defendant SANJAY KUMAR traveled by CA corporate jet to Paris, France, where he met with the Chief Information Officer of a CA customer ("Customer #1").  During the meeting, KUMAR negotiated and finalized a license agreement by which Customer #1 agreed to pay CA approximately $32 million.  The written license agreement, which KUMAR personally signed, was falsely backdated to make it appear as though that the agreement had been finalized and signed on June 30, 1999.  Based on the falsified license agreement with Customer #1, CA improperly recognized as revenue in the First Quarter approximately $19 million, which was the GAAP Value of the agreement.

29.   On or about July 20, 1999, CA filed with the SEC its quarterly report on Form 10-Q and issued a related press release.  In these public documents, CA falsely reported its quarterly financial results, in that CA reported revenue for the First Quarter that included revenue associated with license agreements finalized after June 30, 1999.  Through its false filings and statements, CA reported earnings per share of 49

cents exclusive of non-recurring charges and thereby created the false and fraudulent appearance that CA had exceeded the consensus earnings estimate for the First Quarter by two cents per share.

(2)  Second Quarter of Fiscal Year 2000

30.  The second quarter of CA's fiscal year 2000 included the period from July 1, 1999 to September 30, 1999 (the "Second Quarter"). The consensus estimate for the Second Quarter was that CA's earnings would be 59 cents per share. When the First Quarter ended on September 30, 1999, CA had not generated sufficient revenue to meet the consensus estimate.

31.  On or about and between October 1, 1999 and October 7, 1999, the defendants SANJAY KUMAR and STEPHEN RICHARDS met and conferred with Ira Zar and others regarding the status of CA's revenue for the Second Quarter. In an effort to generate additional revenue during this period, KUMAR and RICHARDS instructed CA sales executives and sales managers to continue to negotiate and finalize additional license agreements, which were falsely dated to make it appear as though the agreements had been finalized by September 30, 1999.

32.  In fact, because the defendant SANJAY KUMAR was displeased that he personally had to "save" the First Quarter by negotiating the license agreement with Customer #1, he required CA's senior regional sales executives to travel from their

regional sales offices to CA's corporate headquarters in Islandia, New York, in order to work on finalizing contracts during the period leading up to and including the first week of October 1999.

33. For example, on or about October 4, 1999, a senior CA sales executive ("Sales Executive #1"), acting on the specific instructions of the defendants SANJAY KUMAR and STEPHEN RICHARDS, finalized a license agreement by which a CA customer ("Customer #2") agreed to pay CA approximately $176 million. The written license agreement fraudulently made it appear that the agreement had been finalized and signed on September 30, 1999. Based on the falsified license agreement with Customer #2, CA improperly recognized as revenue in the Second Quarter approximately $97 million, which was the GAAP Value of the agreement.

34. Similarly, on or about October 6, 1999, CA entered into a license agreement by which a CA customer ("Customer #3") agreed to pay CA approximately $102 million. The written license agreement fraudulently made it appear that the agreement had been finalized and signed on September 30, 1999. Based on the falsified license agreement with Customer #3, CA improperly recognized as revenue in the Second Quarter approximately $65 million, which was the GAAP Value of the agreement.

35. In total, for the Second Quarter CA improperly recognized revenue associated with approximately 33 license

agreements having an aggregate GAAP Value of approximately $467 million.  The improperly recognized revenue represented approximately 29 percent of CA's reported revenue for the Second Quarter.

36.  On or about October 19, 1999, CA filed with the SEC its quarterly report on Form 10-Q and issued a related press release.  In these public documents, CA falsely reported its quarterly financial results, in that CA reported revenue for the Second Quarter that included revenue associated with license agreements finalized after September 30, 1999.  Through its false filings and statements, CA reported earnings per share of 60 cents exclusive of non-recurring charges and thereby created the false and fraudulent appearance that CA had exceeded the consensus earnings estimate for the Second Quarter by one cent per share.

(3)  Third Quarter of Fiscal Year 2000

37.  The third quarter of CA's fiscal year 2000 included the period from October 1, 1999 to December 31, 1999 (the "Third Quarter").  The consensus estimate for the Third Quarter was that CA's earnings would be 90 cents per share.  When the Third Quarter ended on December 31, 1999, CA had not generated sufficient revenue to meet the consensus estimate.

38.  On or about and between January 1, 2000 and January 7, 2000, the defendants SANJAY KUMAR and STEPHEN RICHARDS

15

met and conferred with Ira Zar and others regarding the status of CA's revenue for the Third Quarter.  In an effort to generate additional revenue during this period, KUMAR and RICHARDS instructed CA sales executives and sales managers to continue to negotiate and finalize additional license agreements, which were falsely dated to make it appear as though the agreements had been finalized by December 31, 1999.

39.  For example, on or about January 6, 2000, the defendant STEPHEN RICHARDS directed a senior CA sales executive ("Sales Executive #2") to negotiate and finalize a multi-million dollar license agreement with a CA customer ("Customer #4").  On or about January 6, 2000 and January 7, 2000, Sales Executive #2 induced Customer #4 into executing an approximately $60 million license agreement by offering Customer #4 a substantial discount in the license fee.  The written license agreement was signed on or about January 7, 2000, but backdated to make it appear that the agreement had been finalized and signed on December 31, 1999. Based on the falsified license agreement with Customer #4, CA improperly recognized as revenue in the Third Quarter approximately $38 million, which was the GAAP Value of the agreement.

40.  Similarly, on or about January 6, 2000, the defendant SANJAY KUMAR completed negotiations of a license agreement by which a CA customer ("Customer #5") agreed to pay CA

approximately $300 million.  The written license agreement, which
KUMAR personally signed, had an effective date of December 31,
1999, but did not bear any execution date.  Based on the
intentionally undated license agreement with Customer #5, CA
improperly recognized as revenue in the Third Quarter
approximately $180 million, which was the GAAP Value of the
agreement.

41.  In total, for the Third Quarter CA improperly
recognized revenue associated with approximately 19 license
agreements having an aggregate GAAP Value of approximately $401
million.  The improperly recognized revenue represented
approximately 22 percent of CA's reported revenue for the
quarter.

42.  On or about January 26, 2000, CA filed with the
SEC its quarterly report on Form 10-Q and issued a related press
release.  In these public documents, CA falsely reported its
quarterly financial results, in that CA reported revenue for the
Third Quarter that included revenue associated with license
agreements finalized after December 31, 1999.  Through its false
filings and statements, CA reported earnings per share of 91
cents exclusive of non-recurring charges and thereby created the
false and fraudulent appearance that CA exceeded the consensus
earnings estimate for the Third Quarter by one cent per share.

(4)   <u>Fourth Quarter of Fiscal Year 2000</u>

43.   The fourth quarter of CA's fiscal year 2000 included the period from January 1, 2000 to March 31, 2000 (the "Fourth Quarter").  The consensus estimate for the Fourth Quarter was that CA's earnings would be $1.13 per share.  When the Fourth Quarter ended on March 31, 2000, CA had not generated sufficient revenue to meet the consensus estimate.

44.   On or about and between April 1, 2000 and April 7, 2000, the defendants SANJAY KUMAR and STEPHEN RICHARDS met and conferred with Ira Zar and others regarding the status of CA's revenue for the Fourth Quarter.  In an effort to generate additional revenue during this period, KUMAR and RICHARDS instructed CA sales executives and sales managers to continue to negotiate and finalize additional license agreements, which were falsely dated to make it appear as though the agreements had been finalized by March 31, 2000.

45.   For example, on or about April 7, 2000, a senior CA sales executive ("Sales Executive #3"), acting on the specific instructions of the defendants SANJAY KUMAR and STEPHEN RICHARDS, finalized a license agreement by which a CA customer ("Customer #6") agreed to pay CA approximately $16 million.  Although Sales Executive #3 pressured Customer #6 to sign the written license agreement with an execution date of March 31, 2000, Customer #6 refused, but agreed to sign the agreement without an execution

date.  On the specific instructions of RICHARDS, Sales Executive #3 wrote in by hand a March 31, 2000 execution date on the written agreement, which he then sent by facsimile to CA's headquarters.  Based on the falsified license agreement with Customer #6, CA improperly recognized as revenue in the Fourth Quarter approximately $13 million, which was the GAAP Value of the agreement.

46.  Similarly, on or about April 7, 2000, a senior CA sales executive ("Sales Executive #4"), acting on the instructions of the defendants SANJAY KUMAR and STEPHEN RICHARDS, finalized a license agreement by which a CA customer ("Customer #7") agreed to pay CA approximately $18 million.  The written license agreement was signed on or about April 7, 2000, but CA's signature was backdated to make it appear that the agreement had been signed on March 31, 2000.  Based on the falsified license agreement with Customer #7, CA improperly recognized as revenue in the Third Quarter approximately $10 million, which was the GAAP Value of the agreement.

47.  Similarly, on or about April 7, 2000, Sales Executive #1, acting on the instructions of the defendant SANJAY KUMAR, finalized a license agreement by which a CA customer ("Customer #8") agreed to pay CA approximately $30 million.  The written license agreement was signed on or about April 7, 2000, but backdated to make it appear that the agreement had been

finalized and signed on March 31, 2000.  Based on the falsified
license agreement with Customer #8, CA improperly recognized as
revenue in the Fourth Quarter approximately $16 million, which
was the GAAP Value of the agreement.

48.  Finally, on or about April 6, 2000, a senior CA
sales executive ("Sales Executive #5"), acting on the specific
instructions of the defendant STEPHEN RICHARDS, finalized a
license agreement by which a CA customer ("Customer #9") agreed
to pay CA approximately $39 million.  The written license
agreement was signed on or about April 6, 2000, but backdated to
make it appear that the agreement had been finalized and signed
on March 31, 2000.  Based on the falsified license agreement with
Customer #9, CA improperly recognized as revenue in the Fourth
Quarter approximately $29 million, which was the GAAP Value of
the agreement.

49.  In total, for the Fourth Quarter CA improperly
recognized revenue associated with approximately 14 license
agreements having an aggregate GAAP Value of approximately $199
million.  The improperly recognized revenue represented
approximately 9 percent of CA's reported revenue for the quarter.

50.  On or about May 15, 2000, CA filed with the SEC
its annual report on Form 10-K and issued a related press
release.  In these public documents, CA falsely reported its
quarterly financial results, in that CA reported revenue for the

represented to the United States Attorney's Office, the FBI and the SEC that it was committed to cooperating fully with the Government Investigations.  This representation was also made publicly by CA in press releases, SEC filings and other public statements.  Additionally, in a press release issued on February 20, 2002, CA denied that it had engaged in any improper accounting practices, declaring:  "The reporting of our financial results has always been in accordance with applicable accounting principles."

53.  Shortly after being retained in February 2002, the Company's Law Firm met with the defendants SANJAY KUMAR and other CA executives in order to inquire into their knowledge of the practices that were the subject of the Government Investigations. During these meetings, KUMAR and others did not disclose, falsely denied and otherwise concealed the existence of the 35-day month practice.  Moreover, KUMAR and others concocted and presented to the Company's Law Firm an assortment of false justifications, the purpose of which was to support their false denials of the 35-day month practice.  KUMAR and others knew, and in fact intended, that the Company's Law Firm would present these false justifications to the United States Attorney's Office, the SEC and the FBI so as to obstruct and impeded the Government Investigations.

54.  For example, during a meeting with attorneys from

the Company's Law Firm, the defendant SANJAY KUMAR and Ira Zar discussed the fact that former CA salespeople had accused CA of engaging in the 35-day month practice.  KUMAR falsely denied that CA had engaged in such a practice and suggested to the attorneys from the Company's Law Firm that because quarterly commissions paid to CA salespeople regularly included commissions on license agreements not finalized until after the end of a quarter, the salespeople might assume, incorrectly, that revenue associated with those agreements was recognized by CA within that prior quarter.  KUMAR knew that this explanation was false and intended that the Company's Law Firm would present this false explanation to the United States Attorney's Office, the SEC and the FBI as part of an effort to persuade those entities that the accusations of the former salespeople were unfounded and that the 35-day month practice never existed.

55.  During the course of the Government Investigations, the United States Attorney's Office, the FBI and the SEC regularly requested that CA produce certain CA employees to be interviewed.  As part of his duties as General Counsel, Steven Woghin coordinated CA's compliance with the government's requests.  The defendant SANJAY KUMAR frequently met and conferred with Woghin during the course of the Government Investigations.  Among other things, KUMAR instructed Woghin to meet with CA employees prior to their being interviewed by the

government or by the Company's Law Firm to coach the employees on how to answer questions without disclosing the existence of the 35-day month practice. On several occasions, KUMAR himself coached CA employees on how to answer questions without disclosing the existence of the 35-day month practice.

56. On September 6, 2002, Lloyd Silverstein was interviewed by the United States Attorney's Office, the FBI and the SEC. Prior to that interview, in August and early-September 2002, Silverstein met and conferred with several CA executives. During these meetings, the executives agreed that, acting in concert, they would deny and otherwise fail to disclose the existence of the 35-day month practice, in part by giving intentionally vague or misleading answers to questions about the existence of the practice. Accordingly, during the September 6, 2002 interview, Silverstein did not disclose and otherwise concealed the existence of the 35-day month practice.

57. On or about February 19, 2003, and April 29, 2003, the defendant STEPHEN RICHARDS was interviewed by the Company's Law Firm. During these interviews, RICHARDS did not disclose, but instead falsely denied and otherwise concealed, the existence of the 35-day month practice. At the time of the February 19, 2003 and April 29, 2003 interviews, RICHARDS well knew and believed that certain of the statements he made during the interviews were false and that he otherwise concealed during the

24

interviews information which he knew to be material to the Government Investigations.  RICHARDS further well knew, and in fact intended, that his false statements and concealment of material information would have the effect of obstructing and impeding the Government Investigations.

58.  In or about July 2003, the Audit Committee of CA's board of directors retained a second law firm (the "Audit Committee's Law Firm") to conduct an internal investigation into CA's accounting practices, focusing on the 35-day month practice. As part of its internal investigation, the Audit Committee's Law Firm conducted interviews of CA executives and employees.

59.  On or about October 6, 2003, January 14, 2004, January 22, 2004, and April 6, 2004, the defendant SANJAY KUMAR was interviewed by attorneys from the Audit Committee's Law Firm. During these interviews, KUMAR did not disclose, but instead falsely denied and otherwise concealed, the existence of the 35-day month practice.  For example, KUMAR falsely stated that he had never monitored end-of-quarter contracting activity to determine whether CA would meet analyst earnings estimates. KUMAR admitted that he occasionally encouraged salespeople to close deals after the end of quarters, but stated falsely that these efforts were unrelated to revenue recognition.

60.  The defendant SANJAY KUMAR well knew and believed, at the time of the October 6, 2003, January 14, 2004, January 22, 2004, and April 6, 2004 interviews, that certain of the

statements he made during the interviews were false and that he otherwise concealed during the interviews information which he knew to be material to the Government Investigations. KUMAR further well knew, and in fact intended, that his false statements and concealment of material information would have the effect of obstructing and impeding the Government Investigations.

61. On or about October 22, 2003, the defendant STEPHEN RICHARDS was interviewed by the Audit Committee's Law Firm. During this interview, RICHARDS did not disclose, but instead falsely denied and otherwise concealed, the existence of the 35-day month practice. At the time of the October 22, 2003 interview, RICHARDS well knew and believed that certain of the statements he made during the interview were false and that he otherwise concealed during the interview information which he knew to be material to the Government Investigations. RICHARDS further well knew, and in fact intended, that his false statements and concealment of material information would have the effect of obstructing and impeding the Government Investigations.

(2) Perjury by RICHARDS

62. On October 23, 2003, the defendant STEPHEN RICHARDS testified under oath before the SEC in the Matter of: Computer Associates, Inc., File No. NY 7008. The testimony was taken in Central Islip, New York. During his testimony, RICHARDS gave knowingly and willfully false testimony in an attempt to

26

conceal the existence of the 35-day month practice and his involvement in the practice.

63.  For example, the defendant STEPHEN RICHARDS conceded that when he was the head of CA's sales department he pressured CA sales managers after the ends of quarters to finalize license agreements.  RICHARDS falsely stated, however, that he did so only because these sales managers had not reached their sales quota for the quarter and that revenue recognition was not a motivation for pressuring the sales managers.

64.  The defendant STEPHEN RICHARDS further falsely stated that he had assumed that CA's finance department recognized the revenue from license agreements in the appropriate quarters, even though the agreements contained false signature dates.  RICHARDS further falsely stated that he believed that CA's finance and sales accounting departments had adequate "procedures and controls" to determine that the agreements were, in fact, not executed until after the end of the applicable quarter.  At the time he made these statements, RICHARDS well knew and believed that revenue from license agreements had been booked prematurely, and that CA's finance department did not, in fact, have procedures in place to avoid improperly booking revenue from falsely dated license agreements.

65.  The defendant STEPHEN RICHARDS well knew and believed, at the time of the October 23, 2003 testimony, that

certain of the statements he made during the testimony were false
and that he otherwise concealed during the testimony information
which he knew to be material to the Government Investigations.
RICHARDS further well knew and believed that his false statements
and concealment of material information would have the effect of
obstructing and impeding the Government Investigations.

      (3)  <u>False Statements by KUMAR</u>

      66.  On November 5, 2003, the defendant SANJAY KUMAR
was interviewed by FBI agents and others at the United States
Attorney's Office in Brooklyn, New York.  During the interview,
KUMAR made materially false statements and representations in an
attempt to conceal the existence of the 35-day month practice and
his involvement in the practice.

      67.  For example, the defendant SANJAY KUMAR falsely
stated, in words or substance, that he was never aware of any CA
license agreements that were finalized after the end of a fiscal
quarter but for which associated revenue was recognized in the
prior quarter.  KUMAR admitted that he was aware that CA had a
practice of having a "three-day window" after the end of fiscal
quarters, but falsely stated that the purpose of the three-day
window was merely to "clean up" paperwork and process contracts
administratively.

      68.  The defendant SANJAY KUMAR further falsely stated
that he was unaware of any instance in which he or anyone else at
CA called a CA salesperson after the end of a quarter and

encouraged the salesperson to finalize additional license agreements for the purpose of counting the business in the prior quarter because CA was short on revenue for the prior quarter. KUMAR conceded that he encouraged salespeople to finalize deals after the end of quarters, but falsely stated that his sole purpose in doing so was to motivate the salespeople when their performance had diminished.

69.   The defendant SANJAY KUMAR further falsely stated that he did not have meetings at the end of fiscal quarters to discuss whether CA had met its forecasted revenue expectations. KUMAR falsely stated that he simply assumed that, unless he heard otherwise, CA had generated enough revenue to meet the consensus estimate.

70.   The defendant SANJAY KUMAR well knew and believed, at the time of the November 5, 2003 interview, that certain of the statements he made during interview were false and that he otherwise concealed during the interview information which he knew to be material to the Government Investigations.  KUMAR further well knew and believed that his false statements and concealment of material information would have the effect of obstructing and impeding the Government Investigations.

COUNT ONE
(Conspiracy to Commit Securities Fraud and Wire Fraud)

71.   The allegations contained in paragraphs 1 through 70 are realleged and incorporated as if fully set forth in this

paragraph.

72.  On or about and between April 1, 1998 and April 6, 2004, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants SANJAY KUMAR and STEPHEN RICHARDS, together with Ira Zar, Steven Woghin, David Kaplan, David Rivard, Lloyd Silverstein and others, did knowingly and willfully, directly and indirectly, conspire:

(a) to commit fraud in connection with the purchase and sale of securities issued by CA, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5;

(b) to make and cause to be made false and misleading statements of material fact in applications, reports and documents required to be filed under the Securities Exchange Act of 1934 and the rules and regulations thereunder, in violation of Title 15, United States Code, Section 78ff;

(c) to falsify CA's books, records and accounts, the making and keeping of which was required by Title 15, United States Code, Section 78m(b)(2)(A) and Title 17, Code of Federal Regulations, Section 240.13b2-1, in violation of Title 15, United States Code, Sections 78m(b)(5) and 78ff;

(d) to circumvent CA's internal accounting controls as required by Title 15, United States Code, Section 78m(b)(2)(B), in violation of Title 15, United States Code,

Sections 78m(b)(5) and 78ff; and

(e) to devise a scheme and artifice to defraud
CA shareholders, and to obtain money and property from CA
shareholders, by means of materially false and fraudulent
pretenses, representations and promises, and for the purpose of
executing such scheme and artifice, and attempting to do so, to
cause writings, signs, signals, pictures and sounds to be
transmitted by means of wire communication in interstate and
foreign commerce, in violation of Title 18, United States Code,
Section 1343.

73.   In furtherance of the conspiracy and to effect its
objects, within the Eastern District of New York and elsewhere,
the defendants SANJAY KUMAR and STEPHEN RICHARDS, together with
Ira Zar, Steven Woghin, David Kaplan, David Rivard, Lloyd
Silverstein and others, committed and caused to be committed,
among others, the following:

OVERT ACTS

a.   On or about July 6, 1999, KUMAR and RICHARDS
met with Zar at CA's headquarters in Islandia, New York.

b.   In or about early-July 1999, after meeting
with KUMAR and RICHARDS, Zar caused CA's books for the First
Quarter to be held open in order to allow CA to meet the
consensus estimate for that quarter.

c.   On or about July 8, 1999, KUMAR traveled by

CA corporate jet from Farmingdale, New York to Paris, France.

d.   On or about July 8, 1999, KUMAR signed a $32 million license agreement with Customer #1, which was backdated to make it appear that the agreement had been finalized and executed on June 30, 1999.

e.   On or about July 20, 1999, KUMAR, Zar, Kaplan and others caused CA to file with the SEC a quarterly report on Form 10-Q which was materially false and fraudulent.

f.   On or about August 23, 1999, Silverstein sent an e-mail message to a senior CA sales executive advising that the "projected date for closing Q2" was "October 5th [1999]".

g.   On or about October 4, 1999, Rivard signed on behalf of CA a license agreement with Customer #2, which was falsified to make it appear the agreement had been finalized and signed on September 30, 1999.

h.   On or about October 5, 1999, KUMAR and RICHARDS met with Zar at CA's headquarters in Islandia, New York.

i.   In or about early-October 1999, after meeting with KUMAR and RICHARDS, Zar caused CA's books for the Second Quarter to be held open in order to allow CA to meet the consensus estimate for that quarter.

j.   On or about October 6, 1999, Zar signed on behalf of CA a license agreement with Customer #3, which was falsified to make it appear that the agreement had been finalized

and signed on September 30, 1999.

k.   On or about October 19, 1999, KUMAR, Zar, Kaplan and others caused CA to file with the SEC a quarterly report on Form 10-Q which was materially false and fraudulent.

l.   On or about January 6, 2000, KUMAR and RICHARDS met with Zar at CA's headquarters in Islandia, New York.

m.   In or about early-January 2000, after meeting with KUMAR and RICHARDS, Zar caused CA's books for the Third Quarter to be held open in order to allow CA to meet the consensus estimate for that quarter.

n.   On or about January 6, 2000, RICHARDS placed a telephone call from CA's headquarters in Islandia, New York, to Sales Executive #2.

o.   In early-January, 2000, Woghin drafted a license agreement between CA and Customer #5.

p.   On or about January 6, 2000, KUMAR signed the intentionally undated license agreement with Customer #5.

q.   On or about January 6, 2000, at CA's headquarters in Islandia, New York, KUMAR gave a facsimile copy of the intentionally undated, executed license agreement with Customer #5 to Zar.

r.   On or about January 26, 2000, KUMAR, Zar, Kaplan and others caused CA to file with the SEC a quarterly report on Form 10-Q which was materially false and fraudulent.

s.   On or about April 6, 2000, KUMAR and RICHARDS met with Zar at CA's headquarters in Islandia, New York.

t.   In or about early-April 2000, after meeting with KUMAR and RICHARDS, Zar caused CA's books for the Fourth Quarter to be held open in order to allow CA to meet the consensus estimate for that quarter.

u.   On or about April 6, 2000, at approximately 11:53 a.m., Sales Executive #3 sent an e-mail to KUMAR and RICHARDS relating to the negotiations with Customer #6 which read, in part: "If we could get someone to ask them to 'do us a favor' and sign the contract, leaving the date block blank (they technically can't backdate the signature block, even though the contract says an effective date of 3/31/00 . . . the new company wasn't technically formed until 4/1/00).  I'll take care of fixing any mistakes that they inadvertently leave off the fax contract."

v.   On or about April 7, 2000, at approximately 11:20 p.m., Sales Executive #3 sent an e-mail to KUMAR and RICHARDS relating to the end of the negotiations with Customer #6 which read, in part: "stick a fork in me . . . [t]he eagle has landed.  I'm taking my kids shopping tomorrow - on you! . . . [signed] Mr. B".

w.   On or about April 8, 2000, at approximately 7:33 a.m., KUMAR sent an e-mail to Sales Executive #3 and RICHARDS which read: "Mr. B.  Shopping is on me.  [signed] Mr. K."

x.   On or about April 7, 2000, Rivard signed the license agreement with Customer #7, which he backdated to make it appear the agreement had been executed and signed on March 31, 2000.

y.   On or about May 15, 2000, KUMAR, Zar, Kaplan and others caused CA to file with the SEC an annual report on Form 10-K which was materially false and fraudulent.

z.   On or about and between May 16, 2000 and May 22, 2000, in a series of e-mails, RICHARDS instructed Sales Executive #3 to write in a March 31, 2000 execution date on the official copy of the license agreement with Customer #6.

aa.   On or about September 6, 2002, Silverstein made false statements while being interviewed by the FBI and attorneys from the United States Attorney's Office.

bb.   On or about February 19, 2003, RICHARDS made false statements while being interviewed by attorneys from the Company's Law Firm.

cc.   On or about April 29, 2003, RICHARDS made false statements while being interviewed by attorneys from the Company's Law Firm.

dd.   On or about October 6, 2003, KUMAR made false statements while being interviewed by attorneys from the Audit Committee's Law Firm.

ee.   On or about October 22, 2003, RICHARDS made false statements while being interviewed by attorneys from the

Audit Committee's Law Firm.

ff.  On or about October 23, 2003, RICHARDS made false statements under oath before the SEC.

gg.  On or about November 5, 2003, KUMAR made false statements while being interviewed by the FBI and attorneys from the United States Attorney's Office.

hh.  On or about January 14, 2004, KUMAR made false statements while being interviewed by attorneys from the Audit Committee's Law Firm.

ii.  On or about January 22, 2004, KUMAR made false statements while being interviewed by attorneys from the Audit Committee's Law Firm.

jj.  On or about April 6, 2004, KUMAR made false statements while being interviewed by attorneys from the Audit Committee's Law Firm.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT TWO
### (Securities Fraud)

74.  The allegations contained in paragraphs 1 through 70 and 73 are realleged and incorporated as if fully set forth in this paragraph.

75.  In or about and between April 1, 1998 and April 6, 2004, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants SANJAY

KUMAR and STEPHEN RICHARDS, together with Ira Zar, Steven Woghin, David Kaplan, David Rivard, Lloyd Silverstein and others, did knowingly and willfully, directly and indirectly, use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b5), in that the defendants, together with others, did knowing and willfully, directly and indirectly, (1) employ devices, schemes, and artifices to defraud; (2) make untrue statements of material fact and omit to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and (3) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of CA securities, and by use of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

### COUNTS THREE THROUGH FIVE
(False SEC Filings)

76. The allegations contained in paragraphs 1 through 70 and 73 are realleged and incorporated as if fully set forth in this paragraph.

77. On or about the dates listed below, within the Eastern District of New York and elsewhere, the defendants SANJAY

KUMAR and STEPHEN RICHARDS, together with others, did unlawfully, willfully, and knowingly, make and cause to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, the filings listed below:

| COUNT | FILING | APPROX. DATE OF FILING |
|-------|--------|------------------------|
| THREE | Form 10-Q for Computer Associates International, Inc. for the fiscal quarter ended September 30, 1999 | October 19, 1999 |
| FOUR | Form 10-Q for Computer Associates International, Inc. for the fiscal quarter ended December 31, 1999 | January 26, 1999 |
| FIVE | Form 10-K for Computer Associates International, Inc. for the fiscal year ended March 31, 2000 | May 15, 2000 |

(Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of Federal Regulations, Section 240.13a-1; Title 18, United States Code, Sections 2 and 3551 et seq.)

COUNT SIX
(Conspiracy to Obstruct Justice)

78.   The allegations contained in paragraphs 1 through 70 and 73 are realleged and incorporated as if fully set forth in this paragraph.

79.   In or about and between February 2002 and April 6, 2004, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants SANJAY

KUMAR and STEPHEN RICHARDS, together with Ira Zar, Steven Woghin, David Kaplan, David Rivard, Lloyd Silverstein and others, did knowingly, intentionally and corruptly conspire to obstruct, influence and impede official proceedings, to wit: the Government Investigations.

(Title 18, United States Code, Sections 1512(k) and 3551 et seq.)

### COUNT SEVEN
(Obstruction of Justice)

80.   The allegations contained in paragraphs 1 through 70 and 73 are realleged and incorporated as if fully set forth in this paragraph.

81.   In or about and between February 2002 and April 6, 2004, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants SANJAY KUMAR and STEPHEN RICHARDS, together with Ira Zar, Steven Woghin, David Kaplan, David Rivard, Lloyd Silverstein and others, did knowingly, intentionally and corruptly obstruct, influence and impede, and attempt to obstruct, influence and impede, official proceedings, to wit: the Government Investigations.

(Title 18, United States Code, Sections 1512(c)(2), 2 and 3551 et seq.)

### COUNT EIGHT
(Perjury - RICHARDS)

82.   The allegations contained in paragraphs 1 through 50 and 62 through 65 are realleged and incorporated as if fully

set forth in this paragraph.

83.   On or about October 23, 2003, within the Eastern
District of New York, the defendant STEPHEN RICHARDS, having taken
an oath before a competent tribunal, officer and person, in a case
in which a law of the United States authorizes an oath to be
administered, to wit: in sworn testimony before the Securities and
Exchange Commission, that he would testify, declare, depose and
certify truly, did knowingly, willfully and contrary to his oath
state and subscribe to material matters, as set forth below in the
underlined portions of the SEC proceeding transcript pages, which
he did not then and there believe to be true:

*Page 153, lines 13 through 17; page 153, line 24 through page 154,
line 4:*

    Q   Do you remember any practice within your group of your
        people tendering to clients in negotiations contracts
        that have signature dates already placed in them?

    A   Yes, I do.

        *       *       *

    Q   [W]hat was the purpose of that practice?

    A   <u>Frankly, a very, very subtle sales tool.  It is just
        something to remind the customer that they have a
        commitment to us to complete a transaction in a certain
        time frame.</u>

*Page 179, line 20 through page 180, line 3:*

    Q   Did you ever have an understanding at Computer
        Associates that contracts could be executed by customers
        after the end of the quarter by a few days and still
        count for the quarter?

A    I had an understanding that there could be non-material
     modifications made to an agreement after that particular
     period of time, but that a binding agreement still had
     to have been in place at the conclusion of the quarter.

*Page 206, line 11 through page 208, line 1:*

Q    [I]n those two years when you were head of North America
     1 and head of North America [sales], what was going on
     in Islandia regarding the days after the quarter ended,
     when you are calculating your commitment? Was there any
     reconciliation done that you are aware of to see how
     close Computer Associates had come to reaching the
     [S]treet's estimates in its earnings?

A    Not to my knowledge.

Q    Were you involved in any discussions with, let's say,
     Mr. Kumar regarding whether Computer Associates was
     going to be able to reach the [S]treet's estimates?

A    I don't believe so.

Q    Did you have any discussions with anybody in the final
     days of a quarter or in the final days after a quarter
     ended -- the first days after a quarter ended, regarding
     calculations whether Computer Associates was going to
     reach the [S]treet's estimate?

A    I can absolutely tell you that in that time frame I used
     to find out our performance the same time as everybody
     else did[,] when the press release was published.

     (Title 18, United States Code, Sections 1621(1) and 3551

et seq.)


                        COUNT NINE
               (False Statements - KUMAR)

     84.  The allegations contained in paragraphs 1 through

61 and 66 through 70 are realleged and incorporated as if fully

set forth in this paragraph.

85.   On or about November 5, 2003, within the Eastern
District of New York, the defendant SANJAY KUMAR, in a matter
within the jurisdiction of the executive branch of the Government
of the United States, to wit: the Federal Bureau of Investigation,
did knowingly and willfully (a) falsify, conceal and cover up by
trick, scheme and device one or more material facts, and (b) make
one or more materially false, fictitious and fraudulent statements
and representations, in that he falsely stated and represented to
a Special Agent of the FBI:

(i)   that he was never aware of any CA license
agreements that were finalized after the end of a fiscal quarter
but for which associated revenue was recognized in the prior
quarter; that he was not aware that CA had engaged in a practice
of finalizing license agreements during the "flash period" and
recognizing revenue associated with such agreements in the prior
fiscal quarter; and that the purpose of the "three-day window" was
merely to "clean up" paperwork and process contracts
administratively;

(ii)  that he was unaware of any instance in which
he or the defendant STEPHEN RICHARDS or anyone else at CA called a
CA salesperson after the end of a quarter and encouraged the
salesperson to finalize additional license agreements for the
purpose of counting the business in the prior quarter because CA
was short on revenue for the prior quarter; and that in those
instances in which he pushed salespeople to finalize deals after

42

the end of quarters, his sole purpose in doing so was to motivate the salespeople when their performance had diminished; and

(iii) that he did not have meetings at the end of fiscal quarters to discuss whether CA had met its forecasted revenue expectations; that he simply assumed that, unless he heard otherwise, CA had generated enough revenue to meet the consensus estimate;

when, as KUMAR then and there well knew and believed, each of these statements and representations was materially false and designed to conceal and cover up the existence of the 35-day month practice.

(Title 18, United States Code, Sections 1001(a)(1), 1001(a)(2) and 3551 et seq.)

A TRUE BILL

_Christopher A. Bruehl_
FOREPERSON

_Roslyn R. Mauskopf_
ROSLYNN R. MAUSKOPF
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

No. _____

# UNITED STATES DISTRICT COURT

EASTERN ____ District of __NEW YORK__

CRIMINAL ____ Division

## THE UNITED STATES OF AMERICA

vs.

Sanjay Kumar and Stephen Richards

Defendant.

## INDICTMENT

Cr. No. 04-846 (S-1-) (ILG)
T. 15, U.S.C., Section 78j(b),
78m(a) and 78ff; T. 18, U.S.C., Section 1001
(a)(1), 1001 (a) (2), 1512 (c) (2), 1512
1621 (1), 371, 2 and 3551 et seq.)     (k)

_A true bill,_

_Christopher A. Ourseler_
Foreman

Filed in open court this _____ day.

of _____ A.D. 19 ____

_____
Clerk

Bail, $ _____

Amy Walsh (718) 254-6134

# INFORMATION SHEET

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

MAY 17 2005

BROOKLYN OFFICE

USAO# _2004R02094_____

1. Title of Case:   United States v. Sanjay Kumar and Stephen Richards, 04 CR 846 (S-1) (ILG)

2. Related Magistrate Docket Number(s) _____

          None ( x )

3. Arrest Date:   Self-surrendered on September 23, 2004

4. Nature of offense(s): ☑   Felony
                        ☐   Misdemeanor

5. Related Civil or Criminal Cases - Title and Docket No(s). (Pursuant to Rule 50.3 of the Local E.D.N.Y. Division of Business Rules):   United States v. Lloyd Silverstein, 04 CR 0024 (ILG); United States v. Ira Zar, 04 CR 331 (ILG); United States v. David Rivard, 04 CR 329 (ILG); United States v. David Kaplan, 04 CR 330 (ILG); United States v. Steven Woghin, 04 CR 847 (ILG)

6. Projected Length of Trial:   Less than 6 weeks   ( )
                               More than 6 weeks   (x)

7. County in which crime was allegedly committed:   Kings (related)
   (Pursuant to Rule 50.1(d) of the Local E.D.N.Y. Division of Business Rules)

8. Has this indictment been ordered sealed?        ( ) Yes   (x) No

9. Have arrest warrants been ordered?              ( ) Yes   (x) No

10. Is a capital count included in the indictment?  ( ) Yes   (x) No

                        ROSLYNN R. MAUSKOPF
                        UNITED STATES ATTORNEY

            By:   _____
                  Amy Walsh
                  Assistant U.S. Attorney
                  (718) 254-6134

Rev. 10/01/03

## CALENDAR MINUTES
## ON GRAND JURY PRESENTMENT

BEFORE MAGISTRATE                          DATE: _5/17/05_

1.   THE GRAND JURY OF _Special 4/18/05_____ HANDED UP

_____1_____ INDICTMENT(S) WHICH WERE ORDERED FILED
   (NUMBER)

BY THE COURT.

2.   _____Ø_____ INDICTMENT(S) WERE ORDERED SEALED
        (NUMBER)

BY THE COURT.

3.   _____Ø_____ ARREST WARRANT(S) WERE ORDERED BY THE COURT.

THE GRAND JURY THEREUPON

_____✓_____ RETURNED FOR FURTHER DELIBERATIONS

_____ WAS DISMISSED WITH THE THANKS OF THE COURT

Date: _5/17/05_

UNITED STATES MAGISTRATE    _Steven Gold_

QUESTIONS TO BE ASKED AT GRAND JURY PRESENTMENTS:

(1) WHAT IS THE NAME OF THE GRAND JURY IN SESSION?
_Special 4/18/05_

(2) HOW MANY INDICTMENTS ARE BEING HANDED UP?  _1_

(3) ANY INDICTMENTS TO BE SEALED?   YES_____   NO _X_

(4) ANY WARRANTS TO ISSUE?   IF SO, LIST NAMES UNLESS SEALED.
_NO_

(5) IS THE GRAND JURY RETIRING FOR FURTHER DELIBERATIONS
    OR HAVE THEY COMPLETED THEIR BUSINESS?

          RETIRING _____✓_____

          COMPLETED _____